Philip E. Haebler and Elsie R. Haebler v. Commissioner.
Haebler v. Commissioner
Docket No. 9782.
United States Tax Court
1947 Tax Ct. Memo LEXIS 178; 6 T.C.M. (CCH) 660; T.C.M. (RIA) 47161; June 20, 1947
*178 Held, a debt owing to the petitioner did not become worthless in 1941. John F. Condon, Jr., Esq., 52 Wall St., New York, N. Y., and Jack M. Evans, Esq., for the petitioners. Neil D. McCarthy, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Petitioners in this proceeding seek a redetermination of an income tax deficiency of $3,926.37 for 1941. The issue is whether they are entitled to a bad debt deduction in the amount of $15,000. Findings of Fact Petitioners Philip E. and Elsie R. Haebler, husband and wife, are residents of Montclair, New Jersey. They filed a joint income tax return for 1941 with the collector of internal revenue at Newark, New Jersey. Philip E. Haebler will hereinafter be referred to as the petitioner. The Johnson McKim Johnson Co. was incorporated in December 1925, and engaged in the manufacture of paints and paint products at Linden, New Jersey. The original stockholders of the company consisted of a group of corporations and Theodore Haebler, father of the petitioner. Theodore Haebler owned approximately a 20 per cent interest in the company. Early in 1926, Johnson McKim Johnson Co. purchased from General *179 Carbonic Company property located at Linden, New Jersey, consisting of 3.92 acres of land improved with various buildings, including a onestory building and a two-story building of reinforced concrete, hollow tile and frame construction, adapted for industrial and manufacturing purposes, a two and one-half story house, and miscellaneous sheds. A railroad siding of the Pennsylvania Railroad was located on the premises. The purchase price was $42,500. Subsequently, additional sums were spent on improvements to the buildings. The balance sheet of the company as of April 30, 1928, shows the cost of the land, buildings and improvements in an aggregate amount of $63,051.54. In 1927, Johnson McKim Johnson Co. was short of working capital. It had a number of bank loans and a great many accounts receivable, and it was having some difficulty in building up its sales. In 1928 a new management was procured for the company. Petitioner became active in the business as president and treasurer and undertook a refinancing program. Petitioner's father, Theodore Haebler, who was then in control of a number of corporations, including Saxon Trading Company, agreed that Saxon Trading Company would *180 lend Johnson McKim Johnson Co. $40,000 on the security of a first mortgage on the plant and property of the latter company. The loan was made and the mortgage executed on March 31, 1928. At the same time, in order to provide additional working capital, petitioner lent $15,000 to Johnson McKim Johnson Co. on the security of a second mortgage on its plant and property. Johnson McKim Johnson Co. made interest payments on both the first and second mortgages in 1928 and 1929. In 1929 an attempt was made to sell the business of Johnson McKim Johnson Co., including the plant, to a corporation in New Haven, Connecticut, for the sum of $180,000; but because of the break in the stock market in October, the transaction was not consummated. In November 1929, the inventory, good will, and formulas of Johnson McKim Johnson Co. were sold to one Harry MacMurray, doing business as Bayway Paint & Varnish Company, for a consideration of $10,500 in guaranteed promissory notes. In addition, Johnson McKim Johnson Co. leased its plant and equipment to MacMurray for one year, subject to the liens of the first and second mortgages, at a monthly rental of $500. MacMurray agreed to collect the accounts *181 receivable for Johnson McKim Johnson Co. and turn the proceeds over to it. MacMurray defaulted on his lease and vacated the premises in June or July, 1930. Some time afterwards, while the premises were vacant the buildings were broken into and many of the books and records of Johnson McKim Johnson Co. were destroyed or stolen. In the succeeding years numerous attempts were made to sell the property of Johnson McKim Johnson Co. at a price sufficient to allow the mortgagees to recover on their claims. Petitioner had an agreement with his father and with Saxon Trading Company, the first mortgagee, that if the property could be sold for an amount in excess of $40,000, the amount of the first mortgage, the excess would first be applied to the petitioner's second mortgage. In 1936 negotiations were had with Bopf-Whittan Corporation of Westfield, New Jersey, for the sale of the property for $45,000, but the sale was not completed. Meanwhile, machinery and equipment of the company were sold at auction for $2,500, and a sewer easement was sold to the City of East Orange for $1,000. Some amounts were collected on the MacMurray notes, some from the guarantor, and some of the left-over *182 accounts receivable were collected. The company also sold the remaining merchandise inventories. Some of the proceeds so realized were turned over direct to Saxon Trading Company to be applied to payment of taxes on the property and interest on its mortgage. Sometimes Johnson McKim Johnson Co. paid the property taxes and again such taxes were paid by Saxon Trading Company. More than enough was realized from the above collections to pay all the property taxes from 1930 to 1941. Negotiations for the sale of the property continued until 1941 when an offer was received from the Brooks Warehouse Corporation for $18,000. Petitioner protested that the price was inadequate and his counsel, conferring with petitioner's father, advised that the price was too low. Petitioner's father, however, then the chief administrative officer of Saxon Trading Company, stated that Saxon had held the first mortgage for a great many years, that he was tired of holding it and was determined that the property should be disposed of. Rather than quarrel with his father, who was then almost 80 years old, petitioner acquiesced and executed and delivered a satisfaction of his mortgage; and the property was conveyed *183 free and clear to the purchaser. The net proceeds of the sale were turned over to the first mortgagee and petitioner at no time received any payment on the principal of his mortgage, nor did he receive anything for executing and delivering satisfaction thereof. Petitioner owned a minority stock interest in Saxon Trading Company. In his return for 1941, petitioner deducted $15,000 as a bad debt and respondent disallowed the deduction. The debt owing to petitioner by Johnson McKim Johnson Co. did not become worthless in 1941. Opinion ARUNDELL, Judge: Section 23 (k) (1) of the Internal Revenue Code provides that a taxpayer may deduct "Debts which become worthless within the taxable year". Petitioner first contends that the debt owing to him from Johnson McKim Johnson Co. became worthless in 1941 because the sale of the mortgaged property was an identifiable event taking place in that year so as to fix his loss. He argues that a secured creditor may not deduct a debt until the collateral security is disposed of or becomes worthless, relying on such cases as Kessler Oil & Gas Co., 41 B.T.A. 31; Benton Harbor State Bank, 20 B.T.A. 1106, *184 and Capital City State Bank, 13 B.T.A. 304. We do not think, however, that petitioner's evidence brings him within that rule. Briefly reviewed, the evidence shows that the debt arose in 1928, when petitioner lent $15,000 to Johnson McKim Johnson Co., of which he was president and treasurer. The loan was secured by a second mortgage on the company's plant and property. Saxon Trading Company held the first mortgage on the plant and property to secure its loan of $40,000. Petitioner owned a minority stock interest in Saxon. Johnson McKim Johnson Co., the debtor, ceased operating in 1929 or 1930. In the next year or so some collections were made on its accounts receivable and its machinery and equipment were disposed of at auction. Collections from these sources were apparently just about sufficient to defray taxes and some carrying charges on the real property. After about 1930 the property was the only hope petitioner had of realizing anything on his debt. It has not been shown that petitioner received any interest on his mortgage after 1929. Although more or less continuous efforts were made to sell the property, they were without avail. An attempt to sell it for $45,000 *185 in 1936 met with no success, so it would appear that even then petitioner's second mortgage had little or no value. When we come to 1941, it is obvious that unless the property was worth at least $40,000, the amount of the first mortgage, petitioner's second mortgage then had no value whatever. In an attempt to prove some value for the collateral security as of the beginning of the taxable year, petitioner called an expert witness who testified that in his opinion the land and buildings of Johnson McKim Johnson Co. were worth about $52,500 on January 1, 1941. We are unable, however, to accept the witness's estimate of value, in view of the fact that the property was sold to Brooks Warehouse Corporation free and clear in the same year for only $18,000, about one-third of the value to which the witness testified. Whatever might be the New Jersey rule with respect to opinion evidence as to value, we are bound by the rule prevailing in equity in the District of Columbia ( sec. 1111, Internal Revenue Code) under which sales are regarded as more reliable evidence than expert opinion. See Ruppert v. McArdle, 42 App. D.C. 392; Andrews v. Commissioner, 38 Fed. (2d) 55. *186 There is nothing of record to show why there should have been so great a decline in value after the first of the year, nor is there anything to suggest that the sale was not bona fide and at arm's length. No connection is shown between the Brooks Warehouse Corporation and the debtor, the first mortgagee, or the petitioner. So far as appears, it was a complete outsider. Petitioner himself testified that he had continuously made efforts to sell the property through all these years and that $18,000 was the best offer that could be obtained. In these circumstances, we agree with the respondent that the second mortgage was worthless long prior to 1941, and that petitioner's debt therefore did not become worthless in the taxable year. Finally, petitioner contends that even if the debt did not become worthless in 1941, it was then that he ascertained it to be so, and that he should be allowed the deduction because the law as it existed in 1941 required only that a debt be ascertained to be worthless and charged off. Section 23 (k) (1), however, was amended in 1942 retroactively to cover the taxable year in question, and the criterion for deduction under the statute, as amended, is whether *187 the debt becomes worthless in the taxable year. An argument similar to that which petitioner is here making was considered and rejected by the Second Circuit in Meltzer v. Commissioner, 154 Fed. (2d) 776, certiorari denied, 329 U.S. 723, Oct. 14, 1946. We hold that petitioner is not entitled to the claimed deduction. Therefore, Decision will be entered for the respondent.